### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHAWN SULLIVAN,<br>          Plaintiff,<br><br>     v.<br><br>STANADYNE CORP., STANADYNE<br>RETIREMENT BENEFITS COMMITTEE,<br>          Defendants. | No. 3:13-cv-01288 (JAM) |

### RULING RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Shawn Sullivan is a former employee of defendant Stanadyne Corporation and he is a participant in certain pension plans administered by defendant Stanadyne Retirement Benefits Committee. Plaintiff has initiated this lawsuit against defendants pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, contending that defendants (1) wrongfully excluded certain stock option payouts and bonuses from his pensionable earnings, and (2) denied him full, unreduced early retirement benefits to which he is entitled.

Defendants have moved for summary judgment on the ground that plaintiff's claims are barred by a release that plaintiff signed which generally purported to discharge defendants from liability for alleged violations of ERISA. I conclude that this release plainly precludes plaintiff's claim concerning defendants' exclusion of stock option payouts and bonuses from his pensionable earnings, and I grant summary judgment as to that claim. I also conclude that the release bars plaintiff's claim concerning the denial of full retirement benefits in light of the manner that plaintiff has pleaded this claim. But plaintiff has indicated that the latter claim has been pleaded incorrectly, and it appears that a correctly pleaded claim would not be barred by the

1

release. Accordingly, I will permit plaintiff to file an amended complaint within 30 days if there is an appropriate factual and legal basis to do so.

BACKGROUND

For approximately eleven years—from 1998 to 2009—plaintiff worked as an executive at defendant Stanadyne Corporation ("Stanadyne"), and Stanadyne compensated plaintiff handsomely for his services. Plaintiff's starting annual salary was $110,000, and it eventually grew to about $178,000 by his final year of employment. In addition to his annual salary, plaintiff received certain other compensation during the course of his employment at Stanadyne. As relevant in this litigation, in 2004 plaintiff "received a cash payout of certain previously-earned stock options under [a] Management Stock Option Plan." Doc. #22-2, ¶ 4. Then, in 2006, plaintiff received a bonus from Stanadyne that was known as the "PEPC Sales Bonus." *Id.*, ¶ 7.

By virtue of his employment at Stanadyne, plaintiff became a participant in certain pension plans that are administered by defendant Stanadyne Retirement Benefits Committee ("the Committee"). First, he is a participant in Stanadyne's tax qualified pension plan. Second, he is a participant in Stanadyne's Benefit Equalization Plan and Supplemental Retirement Plan, which are collectively known as the "SERP Plan." The SERP Plan is "an unfunded, nonqualified plan maintained by [Stanadyne] primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees within the meaning of Sections 201(2), 301(a)(3), and 401(a)(1) of [ERISA]." Doc. #22-3 at 6.

During his employment, plaintiff periodically "received statements showing potential pension calculations and SERP calculations." Doc. #22-2, ¶ 9. The record contains only one of these periodic estimated pension benefit statements, dated March 31, 2007, and this statement excludes both the stock option payout and PEPC Sales Bonus from plaintiff's SERP earnings. *See* Doc. #18-3 at 27–30. Nevertheless, plaintiff states that the particular "items of compensation

2

that were included" in pension and SERP calculations "changed over time in response to complaints that employees were making," and that he "expected [that the] calculations [would] continue evolving." Doc. #22-2, ¶ 9.

In November 2009, plaintiff's employment at Stanadyne ended. At that time, plaintiff was not yet 57 years old. As part of a severance agreement, plaintiff signed a "Confidential Agreement and General Release" (hereafter "the Release") in which he agreed to release defendants "from any and all claims, known and unknown, asserted or unasserted, which [he] has or may have . . . including any violation of . . . ERISA" and numerous other federal and state laws. Doc. #18-3 at 7–8. The Release did not, however, "impair any right to the claim for vested pension benefits under Stanadyne's tax qualified pension plan." *Id.* at 9.

In exchange for executing the Release, Stanadyne agreed to pay plaintiff $33,000 in transition pay and $99,000 in severance pay. Stanadyne also agreed to provide plaintiff with medical and dental insurance for approximately seven months, to provide plaintiff with a car allowance for approximately seven months, and to permit plaintiff to keep his work-issued cell phone (among other benefits). Stanadyne allowed plaintiff 45 days to decide whether to sign the Release, and it advised plaintiff in writing to consult with an attorney of his choosing prior to signing the Release. There is no indication whether plaintiff actually consulted with an attorney. What is clear is that plaintiff did sign the Release on December 28, 2009. Plaintiff was allowed an additional seven-day period during which he could revoke the Release. He did not do so; to the contrary, he reaffirmed the agreement in writing on January 8, 2010.

In March 2010, plaintiff received a statement of estimated pensionable earnings—the first such statement that he had received since departing his employment at Stanadyne approximately four months earlier. Plaintiff believed that this was his "final and official statement." Doc. #22-2, ¶ 9. This statement excluded both the stock option payout and PEPC Sales Bonus from plaintiff's

pensionable earnings for purposes of the SERP Plan. Within a few weeks, plaintiff wrote a letter to Stanadyne expressing his opinion that the company had inappropriately excluded these items from his pensionable earnings.

In this same letter, plaintiff also stated his intention to "take early retirement on my 62nd birthday with no reduction in benefit." Doc. #22-3 at 35. This claim may seem odd in view that plaintiff had already left his work at the company before he had turned 57, yet there was a clear economic reason for plaintiff to declare that he would take "early retirement" when he turned 62. Under Stanadyne's pension plan, 65 is generally the normal retirement age, but employees who have completed 10 years of service with Stanadyne may retire and collect a slightly reduced pension as early as age 57, and they are entitled to an unreduced pension at age 62. *See* Doc. #22-3 at 31. For plaintiff, the intended benefit of announcing that he was "retiring" at age 62 rather than age 65 was to be entitled at an earlier age to payment of full benefits rather than reduced benefits.

In May 2010, the Committee responded to plaintiff's letter. In a letter written by the Committee's treasurer, the Committee rejected plaintiff's argument regarding the stock option payout and PEPC Sales Bonus. According to the Committee, neither item fell within the SERP Plan's definition of pensionable earnings.

In addition, the Committee rejected plaintiff's request for payment of an unreduced early retirement benefit commencing at age 62. The Committee interpreted certain provisions of the pension plan to mean that a worker (like plaintiff) whose employment is terminated prior to the early retirement age of 57 is entitled to only a reduced benefit at age 62. Under this interpretation of the plan, workers who leave their employment before age 57 must wait until the age of 65 if they wish to collect unreduced benefits.

Plaintiff asked the Committee to reconsider its decision, but the Committee again rejected

4

plaintiff's arguments and reaffirmed its position that (1) the stock option payout and PEPC Sales Bonus are not pensionable earnings, and (2) plaintiff is entitled to reduced—not full—benefits in the event that he retires before age 65.

Thereafter, plaintiff initiated this lawsuit against defendants. Counts I and II of his complaint challenge both of the Committee's determinations pursuant to 29 U.S.C. § 1332(a)(1)(B),[1] and Count III of the complaint seeks attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1).[2] Defendants have moved for summary judgment on the ground that the Release bars plaintiff's claims in this case.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of

---

[1] 29 U.S.C. § 1332(a)(1)(B) provides in relevant part that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

[2] 29 U.S.C. § 1332(g)(1) provides that "the court in its discretion may allow" the award of reasonable attorneys' fees and costs to either party "[i]n any action under this subchapter," which encompasses 29 U.S.C. §§ 1001 to 1191.

the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The issue before me is whether the Release that plaintiff signed bars as a matter of law

his claims that defendants (1) wrongfully excluded the stock option payout and PEPC Sales

Bonus from his SERP earnings, and (2) wrongfully denied him full, unreduced early retirement

benefits. It is well established that "'an individual can waive his or her right to participate in a

pension plan governed by ERISA.'" *Frommert v. Conkright*, 535 F.3d 111, 121 (2d Cir. 2008)

(quoting *Finz v. Schlesinger*, 957 F.2d 78, 82 (2d Cir. 1992)), *rev'd on other grounds*, 559 U.S.

506 (2010); *see also Lockheed Corp v. Spink*, 517 U.S. 882, 894–95 (1996) (finding that the

conditions of "increased benefits in exchange for" an employee's voluntary waiver of

"employment-related claims" is not prohibited by ERISA). But such a waiver must be "knowing

and voluntary" in view of the "the totality of the circumstances." *Sharkey v. Ultramar Energy*

*Ltd., Lasmo plc, Lasmo (AUL Ltd.)*, 70 F.3d 226, 231 (2d Cir. 1995) (internal quotation marks

omitted). And courts are required to subject releases purporting to waive rights under ERISA to

"closer scrutiny than a waiver of general contract claims." *Ibid.*

The Second Circuit has identified six factors relevant to the determination of whether

such a waiver is knowing and voluntary:

> 1) the plaintiff's education and business experience, 2) the amount of time the
> plaintiff had possession of or access to the agreement before signing it, 3) the role
> of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement,
> 5) whether the plaintiff was represented by or consulted with an attorney, [as well
> as whether an employer encouraged the employee to consult an attorney and
> whether the employee had a fair opportunity to do so] and 6) whether the
> consideration given in exchange for the waiver exceeds employee benefits to
> which the employee was already entitled by contract or law.

*Finz*, 957 F.2d at 82 (alteration in original) (quoting *Bormann v. AT & T Communications, Inc.*,

875 F.2d 399, 403 (2d Cir. 1989)). This list is "'not exhaustive'"; a court must consider all

relevant circumstances. *Frommert*, 535 F.3d at 121 (quoting *Finz*, 957 F.2d at 82).

6

Considering all relevant circumstances in this case, I easily conclude that plaintiff's waiver of his right to bring claims against defendants for alleged violations of ERISA was knowing and voluntary (and plaintiff's counsel conceded as much at oral argument). Plaintiff is well educated, possessing both a bachelor's degree in mechanical engineering and a master's degree in business administration, and he has extensive business experience as a fairly high-level corporate executive. "Given [plaintiff]'s education level and considerable professional achievements, [I] cannot say that he lacked the sophistication to understand what he was reading and giving up in exchange for his severance package." *See Hakim v. Accenture U.S. Pension Plan*, 718 F.3d 675, 684 (7th Cir. 2013). Moreover, plaintiff had ample time—45 days to decide whether to sign the Release, and another 7 days during which the Release could be revoked—to consider whether he wished to waive his rights under ERISA. *See Frommert*, 535 F.3d at 122 (noting that 45 days is an "ample" amount of time "to decide whether to sign [a] release" waiving ERISA rights). While the record is devoid of information indicating whether plaintiff actually consulted with an attorney or attempted to negotiate the terms of the Release, there is no dispute that Stanadyne encouraged plaintiff to seek counsel and that plaintiff had plenty of time to do so. The Release is a reasonably clear 8-page document that describes in plain language the benefits that plaintiff would receive as well as the various claims that plaintiff would waive. Finally, plaintiff received substantial consideration in exchange for signing the Release, including over $130,000 in additional compensation and several months of health and dental insurance. "[T]here is no evidence that a rational person could not have deemed the amount of that payment [as well as other benefits received] adequate compensation for the rights [plaintiff] was giving up." *See Hakim*, 718 F.3d at 684. In sum, there is no genuine issue of fact that plaintiff's signing of the Release was knowing and voluntary.

Having determined that plaintiff's signing of the Release was knowing and voluntary, the

only question is the scope of the Release—whether the language of the Release bars the particular claims asserted in this case. Releases waiving federal statutory rights are contracts, and they are interpreted according to "common-sense cannons of contract interpretation." *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 178 (1st Cir. 1995) (internal quotation marks omitted). Most fundamentally, a court must "giv[e] terms [in a contract] their plain meanings." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (applying federal common law contract interpretation principles to interpret ERISA plan).

In his signed Release with defendants, plaintiff agreed to:

> knowingly and voluntarily release[ ] and forever discharge[ ] Stanadyne, its parent corporation, affiliates, subsidiaries, divisions, predecessors, insurers, successors and assigns, and their current and former employees, attorneys, officers, directors and agents thereof, both individually and in their business capacities, and their employee benefit plans and programs and their administrators and fiduciaries (collectively referred to throughout the remainder of this Agreement as "Releasees"), of and from any and all claims, known and unknown, asserted or unasserted, which [I] ha[ve] or may have against Releasees as of the date of execution of this Confidential Agreement and General Release, including . . . any alleged violation of . . . The Employee Retirement Income Security Act of 1974 ("ERISA") (except for any vested benefits under any tax qualified benefit plan).

Doc. #18-3 at 7–8. By way of exception, the Release expressly provides that "[n]othing [in the document] will impair any right to the claim for vested pension benefits under Stanadyne's tax qualified pension plan." *Id.* at 9. In light of the foregoing language, I conclude that the Release precludes plaintiff from pursuing any claims: (1) that are asserted against Stanadyne and/or its affiliated employee benefit plans; (2) that allege a violation of ERISA, subject to exception for plaintiff's right to vested benefits under a tax qualified benefit plan; and (3) that plaintiff had or may have had ("known and unknown, asserted or unasserted") as of December 28, 2009, the date that plaintiff signed the Release.

Plaintiff's claim regarding defendants' failure to include the stock option payout and PEPC Sales Bonus in his pensionable earnings falls squarely within the bounds of this provision

8

of the Release, and plaintiff has therefore waived his right to pursue the claim. There is no dispute that the claim has been asserted against Stanadyne and its Retirement Benefits Committee. Moreover, the claim arises under ERISA, but it is not an excepted claim for vested benefits under a tax qualified benefit plan.

Plaintiff states that, when he signed the Release, he believed that the language permitting "'claim[s] for vested pension benefits under Stanadyne's tax qualified pension plan'" would encompass "any claims relating to the value of my Pension and SERP." Doc. #22-2, ¶ 2. Even if this was plaintiff's honest understanding, his personal belief cannot be squared with the plain language of the Release and the nature of the SERP Plan. Plaintiff cannot rely on his own subjective belief to impute ambiguity into the contract, because "[w]hether contract language is ambiguous is a question of law that is resolved by reference to the contract alone." *See Fay*, 287 F.3d at 104. The Release unambiguously permits ERISA claims only when those claims involve the right to vested benefits under a tax qualified plan, and it is undisputed that the SERP Plan is *not* a tax qualified plan.

Nor is there any doubt that plaintiff was aware (or should have been aware) of this claim as of December 28, 2009. By that date, plaintiff had received statements of his estimated SERP earnings that *excluded* the stock option payout and the PEPC Sales Bonus. *See* Doc. #18-3 at 27–30. In fact, there are no documents in the record indicating that defendants ever included those items in its statements of plaintiff's SERP calculations. Even accepting as true plaintiff's statement that the particular "items of compensation that were included" in SERP calculations "changed over time in response to complaints that employees were making" and that he "expected [that the] calculations [would] continue evolving," Doc. #22-2, ¶ 9, it cannot be said that plaintiff was unaware of the issue he now raises in this litigation.

As plaintiff himself admits, he knew full well that the issue of whether these items would

be included in SERP calculations remained an open question that was subject to continuing

dispute. On the day he signed the Release, plaintiff could have brought an action pursuant to

ERISA to clarify whether the stock option payout and the PEPC Sales Bonus were pensionable

earnings under the SERP Plan. *See* 29 U.S.C. § 1332(a)(1)(B) (providing that "[a] civil action

may be brought . . . by a participant or beneficiary . . . to clarify his rights to future benefits

under the terms of the plan"). Instead of bringing such a claim or seeking a carve-out in the

Release that would enable him to assert such a claim in the future, plaintiff knowingly and

voluntarily signed a release for valuable consideration waiving all ERISA claims that he had or

might have had.

    After all, "[i]t is obvious that a release is not a device to exempt from liability but is a

means of compromising a claimed liability and to that extent recognizing its possibility." *Callen*

*v. Pennsylvania R. Co.*, 332 U.S. 625, 631 (1948) (Jackson, *J.*). And "[i]t is well established a

general release is valid as to all claims of which a signing party has actual knowledge or that he

could have discovered upon reasonable inquiry." *Fair v. Int'l Flavors & Fragrances, Inc.*, 905

F.2d 1114, 1116 (7th Cir. 1990) (internal quotation marks omitted) (ERISA claim barred where

"the record suggests that [plaintiff] may have had actual knowledge of [defendant's] refusal to

categorize the $85,000 as wages (for pension purposes), and, in any event, certainly had

sufficient constructive knowledge to support the release and covenant not to sue"); *see also*

*Linder v. BYK-Chemie USA, Inc.*, 2006 WL 648206, at *8–10 (D. Conn. 2006) (ERISA claim

barred where plaintiff signed general release waiving all claims arising from an employment

relationship and was "aware that the issue [of whether stock options were included as part of

pensionable income] was unresolved" when he signed the release). Accordingly, I will grant

defendants' motion for summary judgment as to Count I of the complaint.

    For similar reasons, plaintiff's claim to receipt of full retirement benefits beginning when

he turns 62 years old (rather than when he turns 65 years old) is barred by the terms of the Release, at least so far as the complaint pleads that this benefit arises under the SERP Plan and not as part of a vested pension benefit under Stanadyne's tax qualified pension plan (which benefits are expressly exempted from the scope of the Release). In his complaint, plaintiff indicates that this claim involves a "breach of the terms of [the SERP] Plan." Doc. #1-1, ¶ 1. But plaintiff states in his affidavit that "[t]he issue of when I can take an unreduced retirement is . . . a question of the pension plan, not the SERP." Doc. #22-2, ¶10. And at oral argument, plaintiff's counsel explained that the claim is simply mispleaded as an issue that arises under the SERP Plan, when the claim properly arises under the tax qualified pension plan.

Accordingly, I will grant defendants' motion for summary judgment on Count II to the extent that the claim arises under the SERP Plan. But it would not be appropriate in this context to simply close the case without permitting plaintiff an opportunity to re-plead a claim that has apparently been inaccurately alleged. It is well established that a "court should freely give leave [to amend the pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(2). This summary judgment motion arises in an unusual procedural context. Summary judgment motions are ordinarily filed at the close of discovery, long after a plaintiff has had ample opportunity to amend his complaint. Not so here. In this case, the parties (with the Court's permission) deferred a Rule 26(f) conference and the commencement of formal discovery so that the Court could decide the threshold issue whether the Release bars plaintiff's claims. As noted above, the Release in this case unambiguously does not "impair any right to the claim for vested pension benefits under Stanadyne's tax qualified pension plan." Doc. #18-3 at 9.

If the claim regarding a right to unreduced early retirement benefits arises under the tax qualified pension plan (as plaintiff now says), then there would not be any tenable argument that the Release barred the claim. Of course, I express no opinion about whether plaintiff could

11

ultimately prevail on a re-pleaded claim concerning his entitlement to full retirement benefits at

the age of 62, and defendants will be free to raise additional defenses.

CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is GRANTED

to the extent that it targets claims that arise under the SERP Plan.[3] If there is a factual and legal

basis to conclude that the retirement benefits at issue in Count II are vested pension benefits

under Stanadyne's tax qualified pension plan (and therefore outside the scope of the Release),

then plaintiff may file an amended complaint within 30 days with respect to this claim. If an

amended complaint is not filed by July 13, 2015, then the case will be dismissed with prejudice.

It is so ordered.

Dated at Bridgeport this 12th day of June 2015.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[3] Count III of the complaint seeks an award of statutory attorneys' fees. Because attorneys' fees are not available to plaintiff's counsel in light of the grant of summary judgment against plaintiff on Counts I and II, I also grant summary judgment on this claim. Plaintiff may seek an award of statutory attorneys' fees by means of any amended complaint.